**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
Civil Action No.

Allen Zelewski, Richard Conley, Dillon
Rogers, and James Hill,
               Plaintiffs,

    vs.

Robinhood Markets, Inc., Robinhood
Securities, LLC, and Robinhood
Financial, LLC,
               Defendants.
_____/

**CLASS ACTION COMPLAINT**

<u>DEMAND FOR JURY TRIAL</u>

## <u>COMPLAINT</u>

COMES NOW Plaintiffs, Allen Zelewski, Richard Conley, Dillon Rogers, and James

Hill, on behalf of themselves and the class of others similarly situated as defined herein, and

hereby file this Class Action Complaint against Defendants, Robinhood Markets, Inc.,

Robinhood Securities, LLC and Robinhood Financial LLC, and state as follows:

### JURY DEMAND

Plaintiffs hereby demand a trial by jury.

### I.  PARTIES

1. Plaintiff Allen Zelewski ("Zelewski") is a citizen of Florida, resides in

Hillsborough County, Florida, and is over the age of 18.

2. Plaintiff Richard Conley ("Conley") is a citizen of Florida, resides in Flagler

County, Florida, and is over the age of 18.

3. Plaintiff Dillon Rogers ("Rogers") is a citizen of California, resides in Los

Angeles County, California, and is over the age of 18.

4.      Plaintiff James Hill ("Hill") is a citizen of Florida, resides in Alachua County, Florida, and is over the age of 18.

5.      At all times material hereto, Plaintiffs Zelewski, Conley, Rogers, and Hill were customers of Robinhood and utilized its services to acquire, trade, and hold securities in Florida and California.

6.      Defendant Robinhood Markets, Inc. is a corporation formed under the laws of Delaware with its principal place of business at 85 Willow Road, Menlo Park, California 94025. Defendant Robinhood Markets, Inc. is a financial services holding company and is the parent entity of Defendants Robinhood Financial, LLC and Robinhood Securities, LLC.  For the purposes of jurisdiction, Robinhood Markets, Inc. is a citizen of Delaware and California.

7.      Defendant Robinhood Financial, LLC is a Delaware limited liability company. Upon information and belief, the sole member of Robinhood Financial, LLC is Robinhood Markets, Inc. For the purposes of jurisdiction, Robinhood Financial, LLC is a citizen of Delaware and California.

8.      Defendant Robinhood Financial, LLC is a registered broker-dealer with the Securities and Exchange Commission. Defendant Robinhood Financial, LLC acts as an introducing broker and has a clearing arrangement with its affiliate Defendant Robinhood Securities, LLC.

9.      Defendant Robinhood Securities, LLC is a Delaware limited liability company. Upon information and belief, the sole member of Robinhood Securities, LLC is Robinhood Markets, Inc. For the purposes of jurisdiction, Robinhood Financial, LLC is a citizen of Delaware and California.

10.     Defendant Robinhood Securities, LLC is a registered broker-dealer with the Securities and Exchange Commission. Defendant Robinhood Securities, LLC acts as a clearing broker and clears trades introduced by its affiliate Defendant Robinhood Financial, LLC.

11.     Each defendant is addressed individually, however "Robinhood" refers to all three defendants Robinhood Markets, Inc., Robinhood Financial, LLC, and Robinhood Securities, LLC jointly due to their combined actions.

## II.  JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this matter under the Class Action Fairness Act and 28 U.S.C. §1332. The aggregate claims of the proposed class members exceed $5,000,000.00, exclusive of interest and costs, and there are more than 200 putative class members. Plaintiffs, as well as many members of the proposed class, are citizens of a state, or county different from Defendants.

13.     Venue is appropriate in this District pursuant to 28 USC § 1391(b)(2) because a substantial part of the acts and omissions that gave rise to this Complaint occurred or emanated from the Middle District of Florida.

14.     This Court has personal jurisdiction over the Defendants because they are authorized to do business and do conduct business in Florida, and because Defendants have marketed, advertised, and made substantial sales in Florida, and have sufficient minimum contacts with Florida and/or Defendants sufficiently avail themselves of the markets of Florida through its promotion, sales, and marketing within this state to render the exercise of jurisdiction by this Court permissible.

## III. FACTUAL ALLEGATIONS

### a.     Robinhood Markets, Inc. Promotes Access to Trading for Retail Customers

15.     Robinhood Markets, Inc. is an online brokerage firm founded in 2013 that states it is "a pioneer in commission-free investing." Robinhood's customers can place securities trades through the firm's website and by using a web-based application (or "app"). Robinhood permits customers, when its trading platform is operational, to purchase and sell certain securities, including option contracts, and engage in trading on margin. The company has no storefront offices and operates entirely online.

16.     Robinhood Markets, Inc. is not registered with FINRA[1].

17.     Robinhood Financial, LLC and Robinhood Securities, LLC are registered with FINRA.

18.     Robinhood has marketed the services it provides as a way to allow anyone to participate in the stock markets. Robinhood affirmed its position in a tweet[2] from March 23, 2016, stating succinctly:



**Robinhood** ✔
@RobinhoodApp

## Let the people trade.

2:30 PM · Mar 23, 2016 · Buffer

19.     As a way of promoting trading among its customer base, Robinhood has offered a "free stock" program wherein new customers who open an account are eligible to receive a free share of stock from a major company. These shares were given away as a promotion by Robinhood, and the securities came from Robinhood's inventory of settled shares. Among the

---

[1] Financial Industry Regulatory Authority, Inc. ("FINRA") is a private corporation that acts as a nongovernmental, self-regulatory organization that regulates member brokerage firms and exchange markets.
[2] https://twitter.com/RobinhoodApp/status/712708069369782272

securities distributed by Robinhood, many customers received shares of GameStop, Inc. (hereinafter "GameStop") as their free stock for qualifying under the program terms.

### b.      Market Volatility

20.      Starting around January 13, 2021, an unprecedented increase in the trading of several securities, including stock in GameStop as traded under the symbol $GME (the stock hereinafter referred to as "$GME"), created a tremendous amount of volatility—and opportunity—for the investing world.

21.      The leading explanation for the volatility of the $GME stock is that several large hedge funds held extremely large "short" positions that would potentially require these hedge funds to rapidly buy vast amounts of $GME shares in the event the stock price increased. In response to an increase in the price of $GME shares starting around August 31, 2020, the market became increasingly aware of this potential demand to buy shares. Investors saw the opportunity to buy outstanding shares of $GME and hold the shares while demand and price increased, thus allowing them to sell at a premium to the hedge funds that needed to purchase shares at a later date. The price began to increase steadily from August 2020 through mid-January 2021.

22.      Robinhood experienced an influx of new accounts as this volatility and trading volume increased. Customers with investible assets were drawn to the idea of buying and selling shares of $GME and other volatile stocks at a time when general market volatility was low. Many new Robinhood customers created accounts, transferred funds into their accounts, and purchased shares of $GME within the same day. Robinhood was profiting handsomely from this business arrangement and was well aware of the impact that trading in $GME was having on its customer base.

23.    Trading volume increased dramatically on January 13, 2021 as more and more individuals became aware of the opportunities available by investing in $GME.  Along with the increase in volume, the price per share of $GME approximately doubled during this same window.

24.    Shares of $GME hit an all-time high on Wednesday, January 27, 2021. Acknowledging the newfound popularity of the stock, Robinhood sent a message to its users on the evening of January 27, 2021. The message stated: "Update: The markets are experiencing significant volatility and there may be increased risk. It's as important as ever to be an informed investor."

**c.    Robinhood Shuts Down Trading on January 28, 2021**

25.    Stock markets are traditionally open for trading between the hours of 9:30 a.m. ET and 4:00 p.m. ET ("Regular Market Hours"). Since 2018, Robinhood has allowed users to place trades during "Pre-Market Hours" (9:00 a.m. ET to 9:30 a.m. ET) and "After Hours" (4:00 p.m. ET to 6:00 p.m. ET).

26.    At approximately 8:15 a.m. ET—before Pre-Market Hours began—Robinhood users saw a warning when viewing details about certain securities including $GME. A screenshot of the warning, which stated that "This stock is not supported on Robinhood," is shown here:



27.     Users who had already placed orders to buy these restricted securities, including

long-standing orders to buy at a particular price, saw that their orders were preemptively

cancelled.

28.     Customers who had existing positions in these restricted securities were greeted

with a different message as shown below, stating that they could not purchase additional shares:



29.     In a blog post on January 28, 2021[3] during Market Hours, Robinhood stated that it "continuously monitor[s] the markets and make[s] changes where necessary. In light of recent volatility, [Robinhood] are restricting transactions for certain securities to position closing only, including $AAL, $AMC, $BB, $BBY, $CTRM, $EXPR, $GME, $KOSS, $NAKD, $NOK, $SNDL, $TR, and $TRVG."

30.     The restrictions prevented Robinhood customers from entering every type of trade order, with the limited exception of trade orders to close out existing positions.

**d.     Immediate Damages**

31.     At the time Robinhood shut down the ability of its customers to submit orders to buy $GME, when it was trading at approximately $445 per share. Suddenly, at 8:40 a.m. EST, the price of shares of $GME began to drop, falling as low as $263 per share.

---

[3] https://blog.robinhood.com/news/2021/1/28/keeping-customers-informed-through-market-volatility

32.     At 9:00 a.m. EST, upon the start of Regular Market Hours, $GME rapidly rose from $263 to a peak of $483 per share within a span of 30 minutes, meanwhile Robinhood customers were prevented from making trades and forced to watch the value of the stock change from the sidelines.

**e.      Robinhood Decides to Prevent Customer Trading**

33.     The stock markets are familiar with volatility, and the stock exchanges where securities are bought and sold have multiple safeguards to ensure that the volatility is managed equitably. One of these safeguards is a volatility halt, colloquially referred to as a "Circuit Breaker."

34.     Stock exchanges monitor all trading, and if the price of a specific security moves up or down too quickly within a predetermined period (such as five minutes), all trading for that security will automatically and immediately halt. The volatility halts will often last for a few minutes, after which time the markets will immediately reopen to all trading.

35.     Volatility halts are enforced by the exchanges themselves. Accordingly, all brokers and customers are impacted equally by the halt. By comparison, even during periods of peak volatility, broker-dealers do not impose their own restrictions on placing securities trades, instead choosing to allow the exchange to decide when trades are permitted.

36.     Volatility affects different types of investments differently. In addition to stocks, Robinhood and other broker-dealers allow additional trading for types of securities known as derivatives, and these include option contracts, futures, forwards, and swaps.  Derivatives are based on the value of particular stocks, but exist independent of the stocks and have their own separate value. The maximum risk that an investor faces when buying a stock is that the underlying company loses all value, rendering the stock worthless—in other words, the

maximum amount you can lose is the amount you invested. Because derivatives are separate from stocks, the maximum amount you can lose is sometimes more than the amount you invested.

37.     On January 28, 2021, Robinhood proactively decided to impose trading restrictions on its own customers, preventing them from participating in the marketplace. Robinhood stated that its justification for these restrictions was market volatility; however, the exchange-based volatility measures were still fully operational.

38.     By comparison, upon information and belief, other competing broker-dealers were able to access, process, and execute trade orders in the same securities that Robinhood had restricted.

39.     In extraordinary circumstances, a broker-dealer may consider placing restrictions on trading derivatives to prevent damage to the broker-dealer's viability and financial integrity. In extreme circumstances, certain types of derivatives can cause losses that are several orders of magnitude greater than the amount invested. If customers simply cannot afford to cover for these losses, the risk can be shifted onto the broker-dealer to pay for the shortfall. Accordingly, if the volatility of specific securities suddenly poses a serious structural risk to the broker-dealer itself, restrictions on these types of derivative trades in anticipation of these extremely volatile circumstances can be warranted for the benefit of all customers.

40.     However, Robinhood took the extraordinary step of not only prohibiting trades of derivatives, but of the securities themselves. Accordingly, the customers who wanted to acquire positions in these securities are unduly prohibited from participating in market transactions, whereas customers of other broker-dealers do not have similar limitations.

41.     These restrictions prevented Robinhood users from freely participating in major market movements, whereas customers of many other broker-dealers were free to capture the value associated with these market movements. Moreover, these restrictions fly in the face of the principles that Robinhood promoted to its own customers through its marketing materials and customer agreements to "Let the people trade."

42.     Moreover, Robinhood executives had been acutely aware of the growing demand and popularity within its platform for investments in volatile stocks, including $GME, for several months. While Robinhood was actively encouraging stock trading on its platform, Robinhood deliberately chose to remain silent and leave its customers in the dark that preventing trades in popular stocks was a potential consequence of the same increased volatility and volume.

43.     In short, Robinhood chose to deny its customers access to the marketplace despite profiting off the customers who it lured in under the promise of market participation. These customers were harmed by their inability to access the markets during periods of peak volatility due to their choice of Robinhood Markets, Inc. and their relationship with Robinhood Financial, LLC.  Robinhood's customers had no advance warning about a possibility that trades would be declined despite Robinhood knowing full well that this was in consideration.

44.     Vladimir Tenev at all material times was the Chief Executive Officer of Robinhood Markets, Inc.  He had at all times a significant managerial role with respect to the broker-dealer subsidiary of Robinhood Financial, LLC.

45.     On Thursday, January 28, 2021, Vladimir Tenev admitted Robinhood's failure concerning this lack of disclosure to its customers: "We want to be clear in the communications, and I own that we should have been out there a little bit sooner."[4]

---

[4] https://news.trust.org/item/20210129041140-5bple/

46.     Vladimir Tenev is not licensed by FINRA. He does not have a Series 24 license, and lacked the proper qualifications to perform: a) advertising, b) market making, c) trading, and or d) underwriting for Robinhood.

47.     Vladimir Tenev as the CEO of Robinhood was unqualified, unsupervised and had a lack of oversight.

48.     Vladimir Tenev is unregistered with FINRA, and therefore able to avoid the FINRA Broker check tool, which prevents the public from being able to track violations of a broker.

**f.     Robinhood's Negligence**

49.     Robinhood had been acutely aware of the increasing volume of trading in the increasingly volatile securities for weeks, if not months, prior to its decision on January 28, 2021 to cut off trading.

50.     After creating a voluntary halt in trading, Robinhood notified the public after the market hours had closed on January 28, 2021 that it was able to secure the funding it believed necessary to reopen trading beginning Friday, January 29, 2021.

51.     Assuming that Robinhood's decision to halt trading was in fact due to the need for additional capital, Robinhood had advance notice of this problem and yet failed to act in time to ensure that it could continue operations during this period of volatility.

52.     In offering trading services, Robinhood assumed a duty to ensure that its systems were sufficiently equipped to reliably deliver such services under reasonably foreseeable customer demands and market conditions, such as those at issue in the case.  Robinhood acted negligently by failing to adequately or properly maintain the systemic resources and sufficient capital to maintain Plaintiffs' and Class members' access to trading services. Due solely to its

own negligence and failure to maintain sufficient capital, Robinhood breached obligations owed

to Plaintiffs and Class members and caused them substantial losses. Robinhood's failures are all

the more serious due to Robinhood's history of such failures, including several major trading

outages, the absence of alternative means for customers to protect their positions, and lack of

communication and customer support.

53.     Robinhood was undercapitalized.

54.     Robinhood failed to provide adequate disclosure to its customers.

### IV. CLASS ACTION ALLEGATIONS

55.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on behalf of the following Class:

a.      All Robinhood customers within the United States as of January 28, 2021.

b.      All Robinson customers outside of the United States as of January 28, 2021.

56.     **Numerosity**: The proposed Class is so numerous that joinder of all members is

impracticable. The precise number of Class members is currently unknown to Plaintiffs, but

based upon marketing and other public materials, there are approximately 10 million customers

and/or users of Robinhood, all of which are members of the Class.

57.     **Commonality**: There are questions of law and fact common to the Class, and

those questions predominate over individual questions, including inter alia, the following:

whether Robinhood's decision to restrict trading was a violation of various state consumer

production laws; whether Robinhood's decision to restrict trading was a violation of FINRA

Rule 5310; whether Robinhood's decision to restrict trading was a breach of its customers'

contracts and/or the covenant of good faith and fair dealing in connection with the failures

described herein; and whether Robinhood was negligent or grossly negligent by failing to provide agreed-upon services.

58.   **Typicality**: The claims alleged by Plaintiffs are typical of the claims of the Class, as Plaintiffs were customers and/or users of Robinhood during the class period and were unable to place time-sensitive trades and sustained damages due to Robinhood's wrongful conduct.

59.   **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained competent board certified counsel experienced in prosecuting complex actions in the financial services industry and they will vigorously prosecute this action.

60.   **Predominance and Superiority**: The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Prosecution of individual actions by individual Class members would create the risk of different or varied adjudications, establishing incompatible standards of conduct for Defendants.

61.   Class action certification is warranted under Fed. R. Civ. P. 23(b)(1)(A) because the prosecution of separate actions by individual members of the proposed Class would create the risk of inconsistent or varying adjudications with respect to individual Class members, which may produce incompatible standards of conduct for Defendants.

62.   Class action certification is warranted under Fed. R. Civ. P. 23(b)(1)(B) because the prosecution of separate actions by individual members of the proposed Class would create a risk of adjudications with respect to individual Class members which may, as a practical matter,

be dispositive of the interests of the other Class members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

63.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive, declaratory, or equitable relief appropriate with respect to the Class as a whole.

64.    Class certification is also warranted under Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to the Class members predominate over any questions affecting only individual members, and a Class action is superior to other available remedies for the fair and efficient adjudication of this controversy. The amount of damages available to the individual Plaintiffs are insufficient to make litigation addressing Defendants' conduct economically feasible for most in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

65.    Class certification is also warranted under Fed. R. Civ. P. 23(c)(4) because questions of law or fact common to the Class members may be certified and decided by this Court on a class-wide basis.

## V. CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

66.     Plaintiffs and Class members adopt and incorporate paragraphs 1 through 65 in full.

67.     Defendants forced Plaintiffs and Class members to consent to the Robinhood Financial, LLC & Robinhood Securities, LLC Customer Agreement[5] in order to gain access to the Defendants' trading platform. Attached as Exhibit 1.

68.     Defendants breached their contractual duties to Plaintiffs and Class members by not performing the functions of a broker-dealer for Plaintiffs and Class members by placing restrictions on trades outside the authorization of the Customer Agreement.

69.     Defendants' breach also prevented Plaintiffs and Class members from entering trades during an extremely volatile market period, which caused Plaintiffs and Class members to miss multiple profitable trading opportunities.

70.     Plaintiffs and Class members have all been damaged in a similar manner due to Defendants' breach of contract.

71.     Plaintiffs request relief as hereinafter described.

### COUNT II
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

72.     Plaintiffs and Class members adopt and incorporate paragraphs 1 through 65 in full.

73.     Defendants breached their implied warranty of merchantability by failing to provide a trading platform that is acceptable and reasonably fit for the ordinary purposes for

---

[5] Plaintiffs do not have access to an executed copy of same nor are they aware of the existence of one. Exhibit 1 is all that is available and provided to Plaintiffs.

which it was being contracted, which in this case includes but is not limited to the purchase and sale of securities and derivatives.

74.     Defendants are merchants with respect to the kind of goods at issue, as Defendants are broker-dealers engaging in the securities markets.

75.     Plaintiffs and Class members have all been damaged in a similar manner due to Defendants breach of implied warranty of merchantability.

76.     Plaintiffs request relief as hereinafter described.

## COUNT III
## NEGLIGENCE

77.     Plaintiffs and Class members adopt and incorporate paragraphs 1 through 65 in full.

78.     Defendants owed a duty to Plaintiffs and Class members to ensure access to the markets during volatile times. Defendants had a duty to provide a system that permits the trading of securities by customers regardless of market volatility.

79.     Defendants breached their duty to exercise reasonable care by imposing restrictions on trading. Defendants also breached their duty by failing to properly provide adequate support structures, such as obtaining sufficient net capital to meet any requirements necessary to permit the operation of trading activity.

80.     Plaintiffs and Class members have all been damaged in a similar manner due to Defendants' negligence.

81.     Defendants' negligence was the direct and proximate cause of the damages suffered by Plaintiffs and the other Class members.

## COUNT IV
## GROSS NEGLIGENCE

82.     Plaintiffs and Class members adopt and incorporate paragraphs 1 through 65 in full.

83.     Defendants created a series of circumstances that, together, constituted an imminent or clear and present danger amounting to more than the usual peril.

84.     Defendants were aware of the imminent danger. Specifically, Defendants were aware that their trading platform was subject to increased net capital requirements in the event of increased trading in high volatility securities. Defendants had clear notice of the problem with sufficient time to put safeguards in place to continue the operation of its brokerage services, such as applications for loans to meet capital requirements.

85.     Defendants' failure to timely react to this danger occurred in a manner that demonstrated a conscious disregard for the consequences. Defendants' omissions were an extreme departure from the standard of care that is required in the industry. Defendants effectively abandoned their customers from participating in trading in some of the most highly volatile securities that the stock market has experienced.

86.     Defendants' grossly negligent and conscious disregard of their duty to protect their customers' and/or users' assets was the direct and proximate cause of the damages suffered by the Plaintiffs and other Class members.

87.     Plaintiffs and Class members have all been damaged in a similar manner due to Defendants' gross negligence.

## COUNT V
## NEGLIGENT MISREPRESENTATION

88.     Plaintiffs and Class members adopt and incorporate paragraphs 1 through 65 in full.

89.     Robinhood through their actions and advertisements undertook to provide and did provide a platform for securities trading.

90.     Robinhood provided false information in association with its ability to handle securities transactions placed by customers and/or users. Robinhood knew or had reason to believe that it would be forced to halt trading if it failed to take appropriate measures to ensure that trading functions could continue on their trading platform.

91.     Robinhood failed to use reasonable care and competence in obtaining and communicating information about their inadequate trading platform.

92.     Robinhood had a direct pecuniary interest in their customers and/or users continuing to place funds into their Robinhood accounts without knowledge of Robinhood's faulty systems.

93.     The information provided by Robinhood to Plaintiffs and Class members was false.

94.     The conduct of the Defendants as set forth herein was a direct, proximate and/or contributing cause of the injuries suffered by Plaintiffs and Class members.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

95.     Plaintiffs and Class members adopt and incorporate paragraphs 1 through 65 in full.

96.     Defendants, at all times material hereto, owed a fiduciary duty to Plaintiffs and Class members and owed them the highest good faith and integrity in performing financial services on their behalf. Defendants are a fiduciary to Plaintiffs and Class members by virtue of being a licensed provider of financial services and through the Customer Agreement agreed upon between the parties.

97.     Defendants breached their fiduciary duties to Plaintiffs and Class members. Defendants' breaches include, but are not limited to: failing to provide and maintain adequate systems necessary to handle increased trading in volatile securities on its trading platform; failing to warn customers and/or users that Defendants' system and infrastructure was insufficient; failing to provide alternative means to execute trades or other transactions when trading on Defendants' platform was restricted for an extended period of time; failing to comply with all applicable statutory, regulatory, and licensing requirements; failing to execute trades and other transactions on behalf of customers and/or users in violation of FINRA Rule 5310 and other applicable statutory, regulatory, and licensing requirements.

98.     Defendants' breach of their fiduciary duty was the direct and proximate cause of the damages suffered by Plaintiffs and Class members.

99.     Plaintiffs and Class members have all been damaged in a similar manner due to Defendants' breach of fiduciary duty.

## COUNT VII
## VIOLATION OF FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT

100.    Plaintiffs and Class members adopt and incorporate paragraphs 1 through 65 in full.

101.    Section 501.201, et seq., Florida Statutes, prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204.

102.    Plaintiffs and the Class they seek to represent are "consumers" as that term is defined in Section 501.203(7), Florida Statutes.

103.   Plaintiffs and Class members have standing to pursue this claim as they have suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth herein.

104.   Defendants have engaged in, and continue to engage in, unconscionable acts or practices and used unfair or deceptive acts in the conduct of its trade and/or commerce in the State of Florida.

105.   Defendants' business practices, as alleged herein, are "unfair" because they offend established public policy and are immoral, unethical, unscrupulous, and substantially injurious to their customers and/or users. Specifically, Defendants' conduct is unfair because Defendants strategically and purposefully misled customers and/or users into believing that their trading platform was capable and powerful enough to handle the millions of Robinhood users and trading volume related to the same.

106.   Furthermore, Defendants' business practices, as alleged herein, are "deceptive" because they are likely to deceive consumers, including Plaintiffs and the Class they seek to represent.

107.   The policies, acts, practices, and promotions alleged herein were intended to result and did result in the luring in of customer monies to be placed in Robinhood accounts. Robinhood advertised and promoted a robust securities trading platform in an attempt to accumulate more and more customer cash and users, from which Robinhood benefits.

108.   Robinhood took advantage of the trust and confidence of Plaintiffs and the Class they seek to represent, and deceptively advertised their system as a trustworthy trading platform even though Robinhood had full and exact knowledge of their systemic weaknesses related to the anticipated user trading volume of volatile securities.

109.    Robinhood's conduct of misrepresenting their flawed trading system to Plaintiffs and the Class they seek to represent misled Plaintiffs and Class members into believing that the Robinhood trading platform was a safe and able system to house their own personal monies and securities.

110.    Plaintiffs and the Class they seek to represent sustained damages as a direct and proximate result of Defendants' unfair and unconscionable practices. Section 501.211(2), Florida Statutes, provides Plaintiffs and the Class they seek to represent a private right of action against Robinhood and entitles them to recover their actual damages, plus attorneys' fees and costs.

111.    As a result of Robinhood's unfair conduct and deception, Plaintiffs and the Class they seek to represent have been damaged in that Defendants' failure to maintain safeguards to its structure caused Plaintiffs' and Class members' personal finances to be unusable to place multiple types of trades in multiple securities. This unconscionable restriction of customer finances caused Plaintiffs and Class members damages.

112.    Plaintiffs and the Class they seek to represent would have never entrusted their personal finances with the Defendants had the Defendants been honest, truthful, and forthcoming in regards to their known system failures and shortcomings.

113.    Defendants' wrongful business practices alleged herein constitute a continuing course of unfair competition because Robinhood marketed or sold their Robinhood trading platform in a manner that offends public policy and/or in a fashion that is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to its customers and/or users. Plaintiffs and the Class they seek to represent have been damaged by Defendants' deceptive and unfair conduct in that they entrusted and utilized Defendants' ineffective securities trading platform that they otherwise would not have used had Defendants not misrepresented the product.

114.    Plaintiffs and the Class they seek to represent have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

115.    Plaintiffs and Class members have all been damaged in a similar manner due to Defendants' unfair and unconscionable practices.

**COUNT VIII**
**VIOLATION OF CALIFORNIA UNFAIR COMPETITION**
**LAW, CAL. BUS. & PROF. CODE §§ 17200, et seq.**

116.    Plaintiffs and Class members adopt and incorporate paragraphs 1 through 65 in full.

117.    Robinhood has engaged in unfair competition within the meaning of California Business and Professions Code §§ 17200, et seq., because Robinhood's conduct is unlawful, unfair and fraudulent as herein alleged.

118.    Plaintiffs, Class members, and Robinhood are a "person" or "persons" within the meaning of §17201 of the California Unfair Competition Law ("UCL").

119.    The UCL prohibits any unlawful, unfair or fraudulent business practices or acts. Robinhood's conduct, as alleged herein, constitutes an unlawful, unfair and fraudulent business practice that occurred in connection with the marketing, advertisement, and sale of its services.

120.    Robinhood's misleading and deceptive misrepresentations and omissions, concealment and suppression of material fact, as described herein, violated the UCL's unlawful, unfair and fraudulent prongs.

121.    Unlawful Prong: Robinhood's conduct, as described herein, violated the UCL's unlawful prong because: (1) it violates the CLRA in connection with the sale of goods and services; (2) constitutes a breach of contract and/or a breach of the implied covenant of good

faith and fair dealing; (3) constitutes a breach of fiduciary duty; (4) constitutes negligence and/or gross negligence; (5) it violates FINRA Rule 5310 which requires best execution of orders fully and promptly; and (6) has unlawfully and unjustly enriched Robinhood.

122.    Unfair Prong: Robinhood's conduct, as described herein, violated UCL's unfair prong because its conduct violates established public policy intended to regulate the fair and ethical sale of goods and services to consumers as set forth in the CLRA and FINRA, and because it is immoral, unethical, oppressive or unscrupulous and has caused injuries to the Plaintiffs and Class members that outweigh any purported benefit. At all times relevant herein, Robinhood's conduct of misrepresenting and concealing material facts regarding its infrastructure as well as its potential and actual refusal to timely perform from the Plaintiffs and consumers caused them injury by inducing them to use  Robinhood's services they would not have otherwise, causing losses to them. The utility of Robinhood's conduct in misrepresenting and concealing material facts from the Plaintiffs and Class members is far outweighed by the gravity of harm to consumers who have now incurred losses they would not have otherwise.

123.    Fraudulent Prong: Robinhood's conduct, as described herein, violated UCL's fraudulent prong by misrepresenting and concealing material information that caused, or would likely cause, Plaintiffs and Class members to be deceived into using Robinhood's services they would not have otherwise. At all times Robinhood has had exclusive knowledge of its substandard infrastructure that led to the suspension of trading. Plaintiffs and Class members have been harmed and sustained injury as a result of Robinhood's fraudulent conduct in violation of UCL as explained herein.

124.    Plaintiffs have standing to pursue this claim because they have been injured by virtue of suffering a loss of money and/or property as a result of the wrongful conduct alleged

herein. Plaintiffs would not have used Robinhood's services and/or placed trades and made financial transactions through those services had they known the truth, though they have an interest in continuing to use the services in the future should Robinhood fix the problems set forth in this Complaint. As a direct result of Robinhood's actions and omissions of material facts, Plaintiffs and Class members were unlawfully, unfairly, and fraudulently induced to make purchases and financial transactions that they otherwise would not have made; and lost their ability to make informed and reasoned purchasing decisions.

125.    The UCL is, by its express terms a cumulative remedy such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes and/or common law remedies, such as those alleged in other counts of this  Complaint. See Cal. Bus & Prof. Code § 17205. As a direct and proximate cause of Robinhood's conduct, which constitutes unlawful, unfair, and fraudulent business practices, as alleged herein, Plaintiffs and Class members have been damaged and  suffered ascertainable losses, thereby entitling them to recover restitution and equitable relief, including disgorgement of ill-gotten gains, refunds of moneys, interest, reasonable attorney's fees, filing fees, and the costs of prosecuting this class action, as well as any and all other relief that may be available at law or in equity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court find in favor of them and the Class of similarly situated individuals and against Defendants as follows:

a.    Certify this case as a class action;

b.    Designate Plaintiffs as Class Representatives;

c.    Designate Plaintiffs' counsel of record as Class Counsel;

d.    Order appropriate equitable relief to remedy the inappropriate conduct;

e.      Award Plaintiffs and all others similarly situated the full value of all

damages sustained now or in the future as a result of Defendants' conduct;

f.      Award Plaintiffs and all others similarly situated punitive, compensatory, and

other damages, restitution, or disgorgement;

g.      Order injunctive relief including but not limited to an Order requiring that

Defendants be prohibited from restricting trades of securities;

h.      Award Plaintiffs and all others similarly situated any and all other relief as this

Court deems just and proper; and

i.      That this matter be tried by a jury.

February 10, 2021                                         MattLaw®

_____
                                                          Matthew D. Powell, Florida Bar No.: 710148
                                                          Attorney for Plaintiffs
                                                          Service E-mail: Pleadings@MattLaw.com and
                                                          PowellAndEspat@gmail.com
                                                          304 Plant Avenue
                                                          Tampa, Florida 33606
                                                          (813) 222-2222

                                                          And

                                                          /s/ Dario D. Diaz_____
                                                          Dario D. Diaz, Florida Bar No.:  084883
                                                          Law Office of Dario Diaz, P.A.
                                                          Attorney for Plaintiffs
                                                          1101 North Armenia Avenue
                                                          Tampa, Florida  33607-5307
                                                          Telephone:  (813) 259-1017
                                                          Email:  Pleadings@DarioDiazLaw.Com